# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TIFFANNYE M. HAYNES, | CV-15-3068-FVS |
| Plaintiff, | |
| v. | **ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

**THIS MATTER** comes before the Court without oral argument based upon cross motions for summary judgment.  The plaintiff is represented by D. James Tree.  The defendant is represented by Ellinor R. Coder.

**BACKGROUND**

Tiffannye M. Haynes was born on March 5, 1970.  In 2011, Ms. Haynes filed separate applications for Title II disability insurance benefits and Title XVI supplemental security income.  42 U.S.C. §§ 401-434, 1381-1383f.  The Social Security Administration denied both applications, whereupon Ms. Haynes filed the instant action seeking review of the unfavorable rulings.  The following is a

Order ~ 1

partial chronology of events that shed light on the dispute between Ms. Haynes and the SSA:

**August 19, 2008**

Ms. Haynes went to rheumatologist P. Scott Pollock, M.D., due to the pain and numbness she experienced while walking.  (TR 442.)  Dr. Pollock diagnosed "myalgia and myositis" and possibly "carpal tunnel syndrome."  (TR 443.)

**Fall of 2008**

Ms. Haynes returned to Dr. Pollock on several occasions complaining of chronic pain.  On November 20, 2008, she reported "her joints [we]re aching, painful[.]"  (TR 431.)  And on December 1, 2008, she reported "[p]ain level worse now compared to October . . . [c]ould hardly walk last week[.]"  (TR 429.)

**Winter of 2009**

The pain did not go away.  On February 4, 2009, Ms. Haynes advised Dr. Pollock she was experiencing "bad back pain."  He prescribed a variety of medications, with mixed results.  Consequently, he referred her to Larry Murphy, M.D., for a nerve conduction study.  On March 2, 2009, Dr. Murphy diagnosed "mild bilateral carpel tunnel syndrome."  (TR 372.)

**Spring of 2009**

By the spring of 2009, Ms. Haynes had been working for over three years as a medical assistant at Swedish Hospital in Seattle, Washington.  (TR 55.)  As a

Order ~ 2

medical assistant, she had to spend a significant part of each shift on her feet. She thought this circumstance was aggravating the pain in her back and joints. As a result, she requested a change of duties; a request the hospital granted. Instead of working exclusively as a medical assistant, she began spending part of each shift scheduling appointments in the radiology department. (TR 416, 55.) This meant spending a significant amount of time typing on a keyboard. (TR 55.)

**Summer and Fall of 2009**

Ms. Haynes remained under Dr. Pollock's care during the balance of 2009. She obtained some relief from the medications he prescribed, but she also experienced serious side effects. On one occasion, for example, she collapsed at work and was taken to the hospital's emergency room. (TR 406.)

**Spring of 2010**

By May of 2010, if not before, Ms. Haynes' supervisors had become concerned her work performance was being impaired by the medications she was taking. (TR 396.) They began to grow impatient. *Id.*

**Summer of 2010**

At first, the transition from medical assistant to appointment scheduler helped because Ms. Haynes no longer spent as much time on her feet. However, as the months passed, she began to experience excruciating pain in her hands and wrist (TR 395); so much so that by June 24, 2010, she had decided she could

Order ~ 3

not continue working.  (TR 625.)  She left her job and filed a workers'

compensation claim with the Washington State Department of Labor &

Industries.  (TR 395, 393, 625.)  Dr. Pollock wrote a letter asking the hospital to

grant her a three-month leave of absence.  (TR 394.)  Though her supervisors

may have questioned his assessment, they granted the request.  (TR 625.)  She

had follow-up appointments with Dr. Pollock during July and August.  By August

23rd, he thought she should be able to return to work on a limited basis.  (TR

624.

### October of 2010

Ms. Haynes continued to experience significant pain.  (TR 621, 619.)

Accordingly, Dr. Pollock referred her to [William?] Wagner, M.D., a hand

specialist, who gave her a cortisone shot in the right wrist (TR 383), which

helped.  (TR 453.)  Then, near the end of October, she went to surgeon Todd M.

Guyette, M.D.  (TR 453.)  Although Dr. Guyette observed "bilateral median nerve

irritability," he was guardedly optimistic.  He thought she should be able to

recommence work on November 1st.  Id.

### November of 2010

On November 9th, Ms. Haynes saw Dr. Guyette.  He did not observe any

significant changes.  (TR 450.)  Approximately one week later, she told a

member of Dr. Pollock's staff she had returned to work, but she thought this was

Order ~ 4

making her condition worse.  (TR 381.)  Perhaps two days later, Dr. Guyette submitted an assessment to the Department of Labor & Industries.  He indicated Ms. Haynes' impairments interfered with her ability to work.  (TR 451.)  Not only should she limit her use of a keyboard, but also she should exercise caution in lifting heavy objects.  *Id.*  Shortly thereafter, she ceased working.  (TR 617, 68.)  She sought treatment from Dr. Pollock, who determined she was unable to continue working in either of her former positions at the hospital.  (TR 618.)

### December of 2010

On or about December 7th, Dr. Pollock completed a form that is entitled "Certification of Health Care Provider for Employee's Serious Health Condition."  (TR 683.)  He reported Ms. Haynes was suffering from "tendonitis, carpal tunnel, fibromyalgia . . . [and] low & upper back pain."  *Id.*  Her conditions had "flared continuously since returned to this job."  (TR 684.)  He opined she was "unable to perform:  repetitive use of her hands, fingers, [or] stand/sit prolonged."  (TR 683.)  Shortly after Dr. Pollock completed the "Certification of Health Care Provider," Ms. Haynes saw Dr. Guyette, who diagnosed "[r]ight moderate electrodiagnostic carpal tunnel syndrome."  (TR 449.)  He recommended surgery, i.e., "carpal tunnel release."  *Id.*

### January of 2011

Order ~ 5

On January 4th, Ms. Haynes applied for Title II disability insurance benefits.  42 U.S.C. §§ 401-434.  The same day, she had an appointment with Dr. Pollock.  (TR 615.)  Based upon what he observed, he submitted an assessment of Ms. Haynes to the Washington State Department of Social and Health Services.  He indicated her ability to work was "impaired"; that the impairment could be expected to last "6 months"; and that her condition was "deteriorating."  (TR 373.)  He said that during an eight-hour shift, she could stand for one hour and sit for one hour.  *Id.*  He said "repetitive use of hands makes arms, wrists & fingers hurt & worsens carpal tunnel symptoms."  *Id.* at 374.  In response to the question "Is participation in training or employment activities appropriate at this time?," he wrote, "Not able to do so.  Went back to work & had dramatic increase in pain."  *Id.*  One week after Ms. Haynes' appointment with Dr. Pollock, she saw Dr. Guyette.  He continued to recommend surgery, and she accepted his recommendation.  (TR 448.)  Finally, on January 31st, Ms. Haynes applied for Title XVI supplemental security income.  42 U.S.C. §§ 1381-1383f.

**May 23, 2011**

During the spring of 2011, the Washington Disability Determination Services asked psychiatrist Karen Ni, M.D., to evaluate Ms. Haynes.  Dr. Ni conducted the evaluation on May 23rd, and subsequently issued a fairly pessimistic report.  "In my opinion," she wrote, "the patient is not able to work at

Order ~ 6

this time due to her depressed state and fibromyalgia symptoms. . . . She is in too much pain to handle most jobs physically and she lacks motivation from her depression to get to work or focus on work." (TR 529.) Dr. Ni recommended Ms. Haynes' physician prescribe an antipsychotic medication for her and, perhaps, change the antidepressant medication she was taking. *Id.* Assuming the medications were effective, Dr. Ni thought there was "a decent change of [Ms. Haynes] getting back into work again in the next 6-12 months." *Id.*

**June 30, 2011**

Ms. Haynes returned to Dr. Pollock on June 30, 2011 and reported worse pain. (TR 600.) He credited her description of her symptoms, noting she was depressed. Although he did not think her depression was "keeping her from working," he nevertheless concluded, "She certainly can not [sic] work due to her widespread pains, and her entrapment neuropathies as outlined by her hand surgeon and found on prior EMG/NCV studies." (TR 601.)

**October 6, 2011**

On the 6th of October, Ms. Haynes submitted to a physical examination by Raymond West, M.D. Of particular relevance is his assessment of her fingers, hands and wrists. He determined she is able to use them "for most, if not all, daily purposes, as long as the activities are not too repetitive." (TR 582.) By way of illustration, he said, "She is able to remove jar and bottle tops if they have

Order ~ 7

already been loosened.  [However, she] could not grasp and toss a bowling ball, but could grasp a cantaloupe and with a sharp knife she would be able to sever it." (TR 579.)

**October 22, 2011**

Ms. Haynes submitted to another psychiatric evaluation on October 22, 2011.  This evaluation was conducted by Joan Davis, M.D.  Her assessment was generally consistent with Dr. Ni's.  Dr. Davis wrote, "The claimant currently is experiencing vegetative symptoms of depression on her current antidepressant medication regimen.  The depression the claimant experiences is treatable; however the likelihood of improvement within the next 12 months in recovery is questionable . . . ." (TR 587.)  Dr. Davis thought Ms. Haynes' depression would tend to hinder her ability to hold a job.  "Currently the claimant may have difficulty maintaining workplace attendance secondary to her physical limitations as well as her depressive symptoms."  (TR 587.)

**November 2, 2011**

The Social Security Administration asked Eugene Kester, M.D., and Dennis Koukol, M.D., to assess Ms. Haynes' disability claims.  As part of the process, both physicians reviewed Dr. Pollock's notes.  They accurately summarized his assessment of January 4, 2011, but they did not give it much weight because they thought it was contradicted by other evidence in Ms. Haynes' file.  (TR 125.)  Drs.

Order ~ 8

Kester and Koukol also reviewed Dr. Pollock's assessment of June 30, 2011. However, their review of the latter assessment was incomplete.  While they correctly observed he did not think Ms. Haynes' depression prevented her from working (TR 120), they overlooked his determination that Ms. Haynes' "certainly can not [sic] work due to her widespread pains[.]"  (TR 601.)  It's unclear whether this omission affected their ultimate determination, which was that a significant number of jobs exist in the national economy that Ms. Haynes is capable of performing.  (TR 132.)  Given the determinations that Drs. Kester and Koukol made, the SSA denied Ms. Haynes' respective applications for disability insurance benefits and supplemental security income.  (TR 98, 99.)

**December 1, 2011**

At the request of the Washington State Department of Social and Health Services, Dr. Pollock completed another written assessment of Ms. Haynes' condition.  (TR 718-19.)  The assessment appears to have been based upon an examination that occurred on November 22, 2011.  *Id.* at 719.  Dr. Pollock indicated she was capable of lifting a maximum of two pounds.  *Id.* at 718.  In response to the question "Is participation in training or employment activities appropriate at this time?," he wrote, "No training or employment activities possible due to pain."  *Id.* at 719.

**December 23, 2011**

Order ~ 9

Ms. Haynes asked the SSA to reconsider its adverse decisions.

**February 3, 2012**

By February of 2012, Ms. Haynes had moved to Ellensburg, Washington, where she sought medical care from David Jackson, M.D. (TR 659.)

**Spring of 2012**

The SSA presented Ms. Haynes' request for reconsideration to Robert Hoskins, M.D., and Cynthia Collingwood, Ph.D, whose evaluations were substantially similar to those of Drs. Kester and Koukol. Consequently, the SSA denied reconsideration. (TR 134, 135.) Ms. Haynes requested administrative review.

**June of 2012**

Ms. Haynes saw Dr. Jackson multiple times during 2012. During June, Dr. Jackson described her response to various medications:

> The current Diclofenac has been of only mild benefit. Cymbalta was ineffective and not tolerated. Mirapex was not tolerated. Tramadol is of minimal efficacy, she still uses it occassionally [sic] as it makes her drowsy and takes the edge off the pain and allows her to sleep when used. Gabepentin in fairly low doses in past was helpful but had to be stopped as she was still working at the time and it made her a bit too foggy to function at work effectively. She would like to try it again.

Order ~ 10

(TR 843.)

Six days later, Dr. Jackson completed a questionnaire at the request of Ms. Haynes' attorney.  (TR 678-79.)  He said Ms. Haynes' was suffering from fibromyalgia, and he explained why he reached that conclusion.  *Id.*  He described the types of treatment she had received and her response to various medications.  Id.  He said her physical condition was not deteriorating, but that he expected her to miss "4 or more [work] days per month."  (TR 679.)

**April 25, 2013**

An administrative law judge ("ALJ") conducted a hearing with respect to Ms. Haynes' disability claims.  She and her attorney participated.

**June 26, 2013**

The ALJ denied Ms. Haynes' disability claims.  While he found she suffers from severe physical and mental impairments (TR 25), and while he found her impairments are capable of producing the types of symptoms she described (TR 30), he discounted her description of the intensity and effects of her symptoms.  (TR 30-33.)  Not only that, but also he rejected the opinions of Drs. Guyette and Jackson (TR 34, 36) and discounted critical parts of the opinions of Drs. Pollock, Ni, and Davis (TR 34-35).

**March 17, 2015**

The Appeals Council accepted Ms. Haynes' request for review of the ALJ's unfavorable ruling.  While the Council was not satisfied with certain parts of his analysis, the Council ultimately decided Ms. Haynes is not entitled to either disability insurance benefits or supplemental security income.  (TR 6.)

**JURISDICTION**

The Appeals Council's decision of March 17, 2015, is the final decision of the Commissioner.  20 C.F.R. §§ 404.984(b)(3), 416.1484(b)(3).  Ms. Haynes commenced this action on May 7, 2015.  42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

A district court may enter "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*  As a result, the Commissioner's decision "will be disturbed only if it is not supported by substantial evidence or it is based on legal error."  *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986).  "Substantial evidence means more than a mere scintilla, . . . but less than a preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988) (internal punctuation and citations omitted).

**ANALYSIS**

Order ~ 12

Drs. Pollock, Guyette, and Jackson treated Ms. Haynes.  Since they are treating physicians, the ALJ must accept their respective assessments unless he provides "specific and legitimate reasons" that are "supported by substantial evidence in the record."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998).

**Dr. Pollock**

Dr. Pollock's assessments of Ms. Haynes were uniformly pessimistic.  The ALJ first analyzed the assessment he prepared during December of 2010.  The ALJ gave "some weight" to the assessment, acknowledging Ms. Haynes was unable to perform tasks requiring "repetitive use of her hands, fingers, [or] stand/sit prolonged."  (TR 683.)  However, the ALJ did not think Dr. Pollock's assessment established Ms. Haynes is incapable of any performing any work.  As the ALJ pointed out, Dr. Pollock focused on the work Ms. Haynes was performing at Swedish Hospital.  He did not identify "the most [she] can do given her functional limitations."  (TR 34.)  Thus, in the ALJ's opinion, Dr. Pollock's 2010 assessment did not exclude the possibility Ms. Haynes could perform some other job.

Next, the ALJ analyzed the three assessments Dr. Pollock issued during 2011.  The ALJ gave "little weight" to these.  (TR 34.)  To begin with, the ALJ did not think Dr. Pollock adequately explained or justified his opinions.  *Id.*  The ALJ thought Dr. Pollock was simply repeating Ms. Haynes' complaints.  *Id.*  Next, the

Order ~ 13

ALJ questioned whether the "overall medical evidence" supports Dr. Pollock's opinions.  *Id.*  Finally, the ALJ thought Ms. Haynes has engaged in activities that are inconsistent with Dr. Pollock's opinions.

The ALJ's explanation of his decision to discount Dr. Pollock's 2011 opinions raises several issues.  The first issue is whether Dr. Pollock adequately explained and justified his opinions.  On at least three occasions, he answered questions that are set forth on forms.  The latter typically leave scant room for explanation, so it is unsurprising his answers are concise.  But though concise, his answers convey important information.  On December 7, 2010, he wrote that Ms. Haynes was suffering from "tendonitis, carpal tunnel, fibromyalgia . . . [and] low & upper back pain."  (TR 683.)  He said this combination of impairments rendered her unable to perform tasks requiring "repetitive use of her hands, fingers, [or] stand/sit prolonged."  *Id.*  This was the first of at least four assessments of Ms. Haynes' impairments.  The next occurred on January 4, 2011.  In his second assessment, Dr. Pollock reiterated that "repetitive use of hands makes arms, wrists & fingers hurt & worsens carpal tunnel symptoms."  (TR 374.)  On the same page, he wrote, "[Ms. Haynes] went back to work & had dramatic increase in pain."  (TR 374.)  This statement almost certainly reflects information Ms. Haynes provided to him.  So, yes, he did rely upon her subjective assessment of her condition.  But he did not rely exclusively upon information

Order ~ 14

she provided.  He also considered Dr. Guyette's determination that her carpel

tunnel symptoms were serious enough she needed surgery.  (TR 374.)  Dr.

Guyette's determination tended to confirm the reliability of the information Ms.

Haynes provided.  Thus, Dr. Pollock had a reasonable basis for concluding her

ability to work was impaired as of January 4, 2011, and probably would remain

so for at least six more months.  (TR 373.)  Dr. Pollock's pessimistic assessment

did not change during the balance of 2011.  At the beginning of December, he

indicated Ms. Haynes' impairments were such that she could lift a maximum of

two pounds.  (TR 718.)  He added, "No training or employment activities

possible due to pain."  (TR 719.)  Admittedly, he did not explain why he selected

the specific limitations he recorded on the various forms.  In that regard, he was

no different than Dr. West.  (TR 576.)  The latter's report lists the amount of

weight he thought Ms. Haynes was capable of lifting or carrying.  (TR 582.)  Like

Dr. Pollock, he did not indicate why he selected the specific limitations he did.

The second issue is whether Dr. Pollock's opinions are "inconsistent with

the overall medical evidence."  (TR 34.)  In order to place this criticism in

context, it is useful to summarize the information that was available to Dr.

Pollock by the end of 2010.  By that point, he had been treating Ms. Haynes for

over two years, and he had examined her on numerous occasions.  Thus, he

could draw upon observations he had made over an extended period of time;

Order ~ 15

and that was not all.  He also was familiar with the results of tests, examinations, and treatments that had been administered, performed or prescribed by Drs. Murphy, Wagner, and Guyette.  (TR 372.)  Consequently, Dr. Pollock had the benefit of a considerable body of information when it came to assessing Ms. Haynes' impairments.[1]  Despite Dr. Pollock's extensive knowledge of his patient's condition, and despite his obvious expertise, the ALJ decided his opinions are "inconsistent with the overall medical evidence."  (TR 34.)  As authority for this surprising conclusion, the ALJ pointed out Ms. Haynes "has generally normal range of motion and strength throughout the extremities[,] . . . [and] [h]er gait and station is intact[.]"  (TR 34.)  The ALJ thought the preceding circumstances undermine Dr. Pollock's conclusions.  The problem with the ALJ's criticism is that it involves a medical judgment.  Only an expert would be in a position to explain the anatomical or physiological significance of circumstances such as "normal range of motion," "strength throughout the extremities," and intact "gait and station."  A layperson lacks the expertise to insist that an adult

---

[1]    One would have expected the ALJ to turn to Ms. Haynes' other treating physicians for guidance in determining which opinions are, and which opinions are not, consistent with "the overall medical evidence."  The ALJ did not do so. To the contrary, he credited only some of Dr. Guyette's opinions (TR 34), and he gave little or no weight to Dr. Jackson's opinions.  (TR 36.)

woman who has a "generally normal range of motion and strength throughout [her] extremities . . . [and whose] gait and station [are] intact" should be able to do more than Dr. Pollock opined and, thus, his opinions "are inconsistent with the overall medical evidence."  The ALJ overstepped the bounds of his expertise by criticizing Dr. Pollock on this basis.[2]

The third issue is whether Dr. Pollock's opinions are inconsistent with activities Ms. Haynes actually is able to perform.  As the ALJ noted, Ms. Haynes is not bedridden.  For example, she occasionally helps care for her niece's twin children (TR 58-60), which may involve picking them up.  (TR 70.)  She drives (TR 61-2), and she shops for groceries with her daughter.  (TR 74.)  The ALJ decided these behaviors, especially lifting small children, show Ms. Haynes is capable of doing more than Dr. Pollock thought.  (TR 34.)

The ALJ makes an important point.  Evidence Ms. Haynes performed activities that are inconsistent with her alleged limitations would reflect adversely upon her credibility.  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.1998).  And since Dr. Pollock relied heavily upon Ms. Haynes description of her symptoms in evaluating her limitations, any evidence that undermined her

---

[2]    The ALJ did not cite any expert medical analysis in support of his criticism, and it is not this Court's responsibility to comb the record looking for such.

Order ~ 17

credibility would, in turn, undermine the validity of his determinations. Here, the most damaging evidence is Ms. Haynes' admission she lifted her 15-pound nieces. (TR 857.) She first made this admission to Dr. Jackson on March 6, 2012. *Id.* at 856. However, context is important. Ms. Haynes made the admission during the course of an examination by Dr. Jackson. She had gone to him seeking relief from back pain. *Id.* He speculated she may have made the pain worse by lifting her nieces. *Id.* Viewed against that backdrop, it does not appear Ms. Haynes admission demonstrates she can lift 15 pounds without injury. If anything, the record suggests just the opposite.

These, then, are the reasons the ALJ gave for discounting Dr. Pollock's 2011 assessments. As explained above, the second reason is not supported by the record. The ALJ erred by substituting his medical judgment for that of Dr. Pollock. However, the fact the ALJ erred is not necessarily dispositive. Some errors turn out to be harmless. Consequently, the Court must determine whether the ALJ's decision to discount Dr. Pollock's credibility can be sustained despite the existence of a serious error. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir.2008).

Dr. Pollock was a treating physician. Not only did he examine Ms. Haynes on multiple occasions over an extended period of time, but also he had the benefit of assessments that were completed by other specialists; assessments

Order ~ 18

that were largely congruent with his own.  Thus, one would have expected the ALJ to credit Dr. Pollock's opinions.  But surprisingly, he did not do so.  Instead, he decided Dr. Pollock's 2010 opinion was entitled to just "some weight" and his 2011 opinions were entitled to "little weight."  Although the ALJ provided several reasons for his credibility assessments, one is of critical importance; namely, the ALJ's determination that an adult woman who has a "generally normal range of motion and strength throughout [her] extremities . . . [and whose] gait and station [are] intact" should be able to do more than Dr. Pollock opined and, thus, his opinions "are inconsistent with the overall medical evidence."  If that determination is erroneous (and it is), the ALJ's ultimate credibility determination cannot be sustained.  His remaining reasons are just not strong enough.  While, admittedly, Dr. Pollock relied upon information he received from Ms. Haynes, he did not rely exclusively upon such information and he was justified in thinking it was reliable.  And while, admittedly, there is some evidence indicating Ms. Haynes can lift more than Dr. Pollock determined, the evidence is ambiguous at best.  Even under the generous substantial-evidence standard, one cannot say Ms. Haynes engaged in activities that are inconsistent with Dr. Pollock's opinions.

**Dr. Guyette**

Although the ALJ accepted Dr. Guyette's determination that Ms. Haynes' ability to lift objects is impaired, he gave little weight to Dr. Guyette's determination she would need "frequent breaks" and "no repetitive work activities" were she to return to the workplace.  (TR 451, 34.)  According to the ALJ, Dr. Guyette's determination in that regard is "inconsistent with the longitudinal medical evidence."  (TR 34.)  The ALJ reached this conclusion because Ms. Haynes "has had full range of motion of the wrists, elbows and digits without pain . . . [h]er carpal tunnel syndrome was described as only mild or moderate . . . and [s]he has had full strength of the upper extremities."  (TR 34.) The ALJ cited no expert medical analysis in support of this conclusion. Apparently, he relied upon his own assessment of the medical evidence.  In doing so, he erred.  Only an expert would be in a position to assess the anatomical or physiological significance of "full range of motion of the wrists, elbows and digits without pain"; mild or moderate carpal tunnel syndrome; or "full strength of the upper extremities."  By attempting to make such an assessment, the ALJ exceeded the limits of his expertise.

**Dr. Jackson**

Dr. Jackson began treating Ms. Haynes during the winter of 2012.  Late that spring, her attorney asked Dr. Jackson to complete a questionnaire describing her condition.  Dr. Jackson examined Ms. Haynes on June 8, 2012 (TR

Order ~ 20

842), and completed the questionnaire six days later.  (TR 678.)  In response to question 2, Dr. Jackson wrote Ms. Haynes suffers from fibromyalgia.  *Id.*  In response to question 5, he said she needs to lie down "1.5 hours twice daily" as a result of fatigue and pain.  *Id.*  In response to question 11, he indicated she likely would miss four or more days work each month due to her illness.  (TR 679.)

The ALJ gave "little to no weight to Dr. Jackson's opinions."  (TR 36.)  To begin with, the ALJ did not think he was sufficiently familiar with her medical condition to make the determinations he did.  *Id.*  In addition, the ALJ did not think Dr. Jackson's determinations were supported by his treatment notes.  The ALJ thought he had relied too heavily upon Ms. Haynes' description of her symptoms.  *Id.*  Finally, the ALJ observed she had suffered from fibromyalgia for many years, but that despite her illness, she had been able to engage in substantial gainful employment.  *Id.*

The first issue is whether the ALJ had a substantial basis for doubting Dr. Jackson's familiarity with Ms. Haynes.  As the ALJ observed, she had first seen Dr. Jackson just four months before the date upon which he completed the questionnaire.  (TR 659.)  And as the ALJ also observed, Dr. Jackson may not have reviewed her medical records prior to that date.  However, these circumstances need to be interpreted in context.  By June 14, 2012, Dr. Jackson had examined Ms. Haynes eight or nine times.  (TR 842-71.)  Presumably, a

Order ~ 21

physician would develop a fairly accurate understanding of his client's condition after examining her eight or nine times in four months.  Now, a presumption is just that -- a presumption.  It may be rebutted by evidence showing it is unwarranted.  Here, however, the ALJ cited no such evidence.  Consequently, the ALJ lacked justification for doubting Dr. Jackson's familiarity with his client as of June 14, 2012.

The second issue is whether Dr. Jackson had an objective basis for his assessment of Ms. Haynes.  In order to resolve this issue, it is necessary to examine the answers Dr. Jackson gave to the questions that were posed by Ms. Haynes' attorney.  At the outset, Dr. Jackson listed her symptoms and stated they meet the diagnostic criteria for fibromyalgia.  (TR 678.)  He then described her responses to a number of medications.  According to him, the medications that had been prescribed for her provided limited relief.  *Id.*  That being the case, he thought the prognosis was "poor."  (TR 679.)  This, in turn, prompted him to adopt a pessimistic assessment of Ms. Haynes' ability to return to the workplace.

One can see Dr. Jackson's methodology in his answers.  He began with a diagnosis, *viz.*, Ms. Haynes suffers from fibromyalgia (a diagnosis which is not in dispute).  He then described the manner in which she responded to various medications.  The information he included in this answer (*i.e.*, his answer to question 6) is drawn from his notes regarding the June 8th examination.  (TR

Order ~ 22

843.)  Obviously, he had to rely upon information Ms. Haynes provided in order

to assess the efficacy, or lack thereof, of particular medications.  However, the

ALJ has provided no reason to think Dr. Jackson's reliance on her statements was

unsound from a methodological point of view or that he should have doubted

the validity or reliability of her statements.  This, then, appears to be a case in

which a physician has received reasonably accurate information from his

patient.  Not only that, but also this is a case in which the physician's diagnosis is

supported by the information he has received; a case in which his patient's

description of her symptoms is consistent with the illness he has diagnosed; and

a case in which his patient apparently has not responded well to treatment.  In

such a case, the physician is justified in adopting a pessimistic prognosis.

       The third issue is whether the ALJ properly discounted Dr. Jackson's

assessment of Ms. Haynes on the ground she has a history of coping with her

illness.  As the ALJ pointed out, she told Dr. Jackson she had been diagnosed with

fibromyalgia when she was 24 years old.  (TR 660.)  Despite the diagnosis, she

was able to engage in substantial gainful employment for many years.

Consequently, the ALJ wondered why she cannot continue to do so?  Ms. Haynes'

answer is that her condition grew worse with the passage of time and the

physical stresses of the jobs she was performing.  There is no reason to think her

treating physicians would disagree with her answer.

Order ~ 23

To summarize, the ALJ's reasons for discounting Dr. Jackson's assessment of Ms. Haynes are not supported by substantial evidence. Dr. Jackson examined her eight or nine times prior to completing the questionnaire submitted by her attorney. Absent extraordinary circumstances, a physician should be able to accurately assess his patient's condition after examining her eight or nine times, especially when the examinations occur within a four-month period. The ALJ failed to establish Dr. Jackson needed more examinations than that in order to accurately assess the impact of Ms. Haynes' impairments. Nor did the ALJ establish Dr. Jackson's assessment was based upon unreliable information or unsound methodology. To the contrary, there is every reason to think his assessment constitutes a reasonable interpretation of the information that was available to him.

**CONCLUSION**

Although the ALJ conscientiously reviewed the record, he failed to provide an adequate explanation of his decision to discount the assessments of Ms. Haynes' treating physicians. What is more, the error is not harmless. Their opinions provided powerful support for her claims. Thus, the ALJ's decision to discount their opinions cannot be characterized as "inconsequential." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). Where, as here, a prejudicial error has occurred, "the proper course, except in rare

Order ~ 24

circumstances, is to remand to the agency for additional investigation or explanation[.]" *Id*., (internal punctuation and citation omitted).  Whether this is one of those rare circumstances requires further analysis.  The Court must conduct a three-step inquiry.  *Id*. at 1100.  The first step is to determine "whether the 'ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  *Id*. at 1100-1101 (quoting *Garrison*, 759 F.3d at 1020).  As explained above, that type of error occurred in this case.  Consequently, the Court must press on to the second step in the inquiry, *viz*., whether "'the record has been fully developed'."  *Id.* at 1101 (quoting *Garrison*, 759 F.3d at 1020).  Here, it is difficult to discern any additional evidence that would be admitted at a second administrative hearing that would have a bearing on the credibility of Ms. Haynes' treating physicians. Were the Court to remand for further administrative proceedings, it is likely the ALJ would end up examining the same evidence he considered after the first hearing.  That being so, the Court advances to the third step in the inquiry, *viz*., whether, given the record as a whole, there is any uncertainty as to the outcome of the proceedings.  *Id*. at 1101. If a second administrative hearing is held, and if the ALJ credits the testimony of Ms. Haynes' treating physicians, then the ALJ will almost certainly rule she is disabled.  It follows, therefore, this is one of

those rare cases in which it is appropriate to reverse and remand with instructions to award benefits to the claimant.[3]

**IT IS HEREBY ORDERED**:

1.  The defendant's motion for summary judgment (**ECF No. 13**) is **denied** and the plaintiff's (**ECF No. 19**) is **granted**.

2. Both the ALJ's decision of June 26, 2013 (TR 39) and the Appeals Council's decision of March 17, 2015 (TR 6) are reversed.

3. The case is remanded with instructions to award disability benefits.

**IT IS SO ORDERED**.  The District Court Executive is hereby directed to file this Order, enter judgment accordingly, furnish copies to counsel, and close the case.

**DATED** this 12th day of December, 2016.


s/Fred Van Sickle
FRED VAN SICKLE
Senior United States District Judge

---

[3] In view of this disposition, it is unnecessary to address the ALJ's decision to discount the opinions of Drs. Ni and Davis.